May it please the court, I'm Chris Speyer here on behalf of the appellant Shoshone County. If I may, I'd like to reserve five minutes. We are here, of course, on an RS-2477 case. When cases of this sort reach the federal courts, they tend to be hot-button cases. They often involve virulent ideological battles between sagebrush rebels versus the federal government, often with the pro-government environmentalists allied with the federal government. Idaho is different. It is rare in Idaho to have the federal government as a party to one of these public road access cases. The reason for that is that most RS-2477 roads in Idaho are on private land, at least those that have been contested. They were on public land, of course, when they were created, but they have long since been patented. As a result, the typical fact scenario in Idaho is often involving a private property defending rancher who has placed a gate across a road that has been used for generations, blocking public access, essentially turning that ranch into a private hunting preserve, accessing public lands. Let's get to this case, though. Yes. Now, these were cross motions for summary judgment, correct? They were, yes. So, I mean, essentially, it's a little bit like this was the trial, as it were. So, I want to kind of clarify your position just so that I put my focus right. Do you contend that the district court erred in its interpretation of Idaho law, that it erred in applying that law to the facts of the case, or do you contend both of those? It is primarily a question of Idaho law, Your Honor, or at least mixed questions of fact and law. I sort of read your disagreement, not that the court had the wrong law, that it was discussing the wrong law. You just interpreted the law to mean something other than what the court said. I suppose that's correct, Your Honor. There's no doubt as to what the standard is. The standard was established in the Kirk case, Kirk v. Schultz, in 1941. That is the standard that says that the public use must be regular and not casual or desultory. How do you say that? Desultory, I believe. Oh, desultory. Okay, I was desultory, but I only said it in my head. I never heard anyone say it. Where did the district court go wrong, then? Where it went wrong is that it recognized that there was continued public use, Your Honor. The court focused on the failure of the town of Eagle after one year. The town went bust. We all agree with that. But the court recognized and found factual inferences, which showed that there continued to be miners that operated mines and mining planes that were accessed by Eagle Creek Road. But, all right, if you get to the facts and where the court's making determinations of the facts, that gets to be a more difficult hill for you to climb. So you sort of have to go back to the law. And where did the court go wrong? Because we look at the state court decisions beyond the rule that public use requires regular use, not casual or desultory use. So where did the court go wrong on that? It misapplied two cases. The controlling decisions, in my view, are Galley v. Idaho County and Sopanic v. Lemhi County. And those cases are cases in which the Idaho Supreme Court found that it was an appropriate, a reasonable inference to find public use sufficient to satisfy the standard in Kirk in the case of the Galley case based on the existence of a road and a few cabins, in the case of the Sopanic case based on the existence of the road and four mining planes. Here we have seven mining planes. So based on those two fact settings and the decision of the Idaho Supreme Court that that supported a reasonable inference of public use that was not casual and not desultory, the same result should occur here. Judge Paez, you're looking at me. Yes. I don't quite follow that. I thought the court was saying in Kirk that that wasn't sufficient. Well, Your Honor, we don't know what the facts are in Kirk because in the Kirk case, the court simply said the record is in conflict and we're going to, but we found sufficient evidence that we're not going to upset it. We do know what the facts were in the Sopanic case and the Galley case. And those cases are very recent and they are on point and they are relevant to what happened here. So we're looking at a five-year period between 1883 and 1893, correct? That is correct, Your Honor. Okay. So tell me the – essentially, as I understand it, when you have cross motions for summary judgment, both the parties are saying there are no factual issues in dispute. That is correct, Your Honor. We agree on the material facts. That is correct. I'm surprised, Judge, that the district court didn't order the parties to sit down and draft a stipulated set of facts that they both agreed upon. I was not there at the time. That apparently didn't happen. But in any event, you're both saying there are no disputed facts. That is correct, Your Honor. Okay. So taking that proposition, what are the facts that are not in dispute that add up to the five-year, meet the five-year requirement for public use or whatever it was? We know that the road was in existence and that there were seven mining claims in addition to an unspecified number of placer claims, seven load claims. And that is sufficient. That's sufficient? Absolutely, Your Honor. That's the whole point. Do you know whether the mining claims were being worked? Yes, Your Honor. We do know that they were being worked. How do we know that? Because there was a mineral survey that occurred several years later. The federal government doesn't undertake mineral surveys unless they are being worked, and the district court in this case identified and said on several occasions that they were being worked. And on the seven mining claims, do we have any idea how many people would have been working those claims? We don't know. Is it sufficient if there was just one on each claim? We just had seven people? That's conceivable. It could have been seven. It could have been more. Do we know what they would have been taking? Are they just walking in? No, Your Honor. What do we know? What we do know, we do have one record, which the district court identified describing it as a good wagon road. It is not a requisite that it be a good wagon road. You can have one. But we actually don't know if any wagons were actually going over it. Your Honor, it is very – Do we know whether any toboggans were being dragged over it in the winter? Well, yes, there was evidence. But I don't think we have evidence of five years of toboggan use. What we do have is five years of people accessing mining claims, seven or more mining claims, which is more than was sufficient. Could only access those mining claims through Eagle Road? Well, Your Honor, they would access them with the most convenient road, and Eagle Creek Road was the closest. They were very close. Some of them were right on Eagle Creek Road. The Kirk case refers to Wellmark used as a stock trail and by miners, hunters, fishermen, and persons on horseback. Yes, and that is a mystery, Your Honor, because the court does not tell us what the facts are. The court says that the facts were in dispute. It does include that sentence, Your Honor, but the court does not go into what the facts are and what the facts were on the other side. And ultimately, the court says, well, whatever the facts were that were in dispute, we found that there was enough. And so I think all we can take out of the Kirk case, Your Honor, is the standard that it must be regular use and not casual or desultory. And I think it's important to recognize that the use of the – to miners, hunters, fishermen, and persons on horseback is in a paragraph that begins with the words, the evidence clearly established. So we know it's apparently not disputed that there were miners, hunters, fishermen, and persons on horseback. But all of those words end in S, which would suggest there's at least two. There's four different groups. That would suggest sort of a minimum of eight people. That is correct, Your Honor. But how can we reconcile that with the decision in the Sipanik and Galley cases? Those cases provide a far more detailed factual record. And for instance, in the Sipanik case, the court found that there was sufficient evidence based solely on the fact that there were four mining claims upstream of the road, of the Anderson Creek Road, which was the road at issue there. If four mining claims were sufficient, and the court didn't say, and they were huge mining claims, or there were lots and lots of people, it just said, well, there were four mining claims. That is sufficient evidence. Likewise, in the Galley case, there were what was described as a few cabins. And the court found that that was sufficient going forward. The court would not go backwards in time before the existence of that documentation, but it was willing to go forward two years. And it seems to me that those are the cases that the court ought to be focusing on, not the Kirk case, which, frankly, just doesn't flesh out what the facts were. It can't be that the standard. I'm looking at Sipanik, and I just looked at Kirk. I mean, there's actually a lot more facts in Kirk than there are in Sipanik. All we've got in Sipanik is a reference that says the deed specifically indicates by 1881 at least four mining claims were located adjacent to or very near ACR along its whole length. That's not a lot of detail. But, Judge Bybee, to me, that's what is so important. That is what the court found was sufficient. Oh, I think you've barked up the right tree. I just think you've overestimated what the strength of the facts are in Sipanik. I see one sentence here that says there's four mining claims. It has no detail on whether they're big claims, little claims, multiple people working them, whether they're dragging toboggans or running wagons or anything else. So we just don't have anything else there. We don't, and to me, that's the important point is that you don't need anything else. And I think we need to look at the words casual and desultory to understand why you didn't need more than that. So I gather what your argument is is that because there was the Eagle Creek Road or whatever it was, was in existence, and there was the little town and whatnot, and then there were these mining claims, that the district court should have inferred from all of that that the Eagle Creek Road was in existence, public use, for five years between 1883 and 1893. Exactly, Judge Piaz. That is exactly what I'm saying, and that is exactly what the Supreme Court did in the Sipanik case. That was my case, and we put on lots of facts, but the court ultimately said all I need to know is that there were four mining claims there. It didn't bother to write about anything else. It said there were four mining claims. Why did that? Given that the gold, I mean, this little town didn't survive much longer than a year, everybody seems to agree that there are these mining claims, why is it a reasonable inference that it continued on for five years? What do you mean by it, Your Honor? I don't expect you to answer that question, but we know that the town did not survive, but we do know that the mining claims did. There was one mine that is described in the district court's decision that continued to produce gold, not a lot of gold, but it continued to produce gold for, I believe, 20 years, if I recall correctly. And the point is that these, you know, for example, we see the word miners in the Kirk case. What were the miners? They may have been, maybe it may have been a reference to prospectors. Again, we don't know what the facts are in Kirk. There's a difference between prospectors and people who were working at the mine. On this record, why wasn't it just as reasonable for the district court to draw the inference that it did, that there wasn't five years of regular public use? Because, Your Honor, we know that the claims were worked. They were not abandoned. The ability to access those claims, to work those claims, is exactly what the Congress envisioned in 1866 when they enacted RS-2477. They wanted people to go out and settle the West. The West was settled, particularly in Idaho, in fits and starts. Not every boom town survived. But if people hung on, if there was a road that was built and they continued to use that road to access their mines, that is the opposite of casual and desultory. That is not wandering around saying, gosh, I wonder if there might be some gold here. That's what a prospector might do. He might wander this way one day and that way the next day. That's what the berry pickers and the wood gatherers did in the Latin case. But if somebody has a claim and they are going to work it. Do we know if they actually worked it? Yes, we do, because they were ultimately patented. They appear on the plat that was created. There were two surveys in 1887 and 1888. And we know that the federal government and the surveyors would not have put those on the plat unless they were being worked. And the district court found that. The district court specifically talked about assessment work and further development of those claims, which is a prerequisite of ultimately going to patent. And so they were being worked. And all of the evidence, and the district court never denies it. That's why, you know, I thought that Judge Callahan's question was so important. What we know is what we can find in the district court's opinion and in the Moon Report, which is MUHN, which is the report offered by the federal government. You don't need to believe. In fact, that's the reason that in the brief that I submitted to you, I didn't quote a single fact that was offered by the county. I quoted only the facts that were found by the district court and offered by the federal government, because they are sufficient to satisfy this test of not casual or desultory. It's the nature of the use. It doesn't take a great deal of use. So it's essentially assume these facts being correct as a matter of law that doesn't meet the public use requirement. That is exactly it, Judge Callahan. Okay. Did you want to save some time for relay? I will. Thank you very much, Your Honor. Thank you. May I please support John Arbab for the United States? With your voice up. Yes. Thank you, Your Honor. With the Court's permission, I'd like to address the jurisdictional issue since it did not come up, and obviously we think that it's important. Well, let me ask you about that, just in terms of that. All right. If an initial environmental, because your approach to this statute of limitations doesn't just affect this case. It would affect a number of APA type of cases, right? I disagree, Your Honor. The APA test is completely different. Well, okay, but if the environmental assessment concludes that an environmental impact report needs to be made, is the government bound by any assertions that it made in its initial assessment? Well, the critical thing for a Quiet Title Act claim is, Your Honor, that in the environmental assessment document, the government is clearly claiming the right to block, to cut off any historic access that the county or the public or anyone else has to this road. So you want this to stand for the proposition that any time the government issues an EA on a quiet title, in a quiet title, that would be that that always starts the running of the statute of limitations. Well, Your Honor, it would depend on exactly what the EA said, and it is a – Well, and so then that's – so it does have other implications. It is somewhat fact specific. Yes, but I would add that this appears to be the first time that I was able to find where an EA, a NEPA document, became relevant in a Quiet Title Act context. So I would say that it's probably an unusual case where this kind of NEPA document, environmental document, is being claimed as the triggering event for a Quiet Title Act claim. And certainly the final – So does it depend on what type of EA is done, and then they have to get into the facts of the EA or – No, Your Honor, it's clear. All you need to do would be, just like in this case, look at what the EA says. If they filed suit and the district court started proceedings and the EA wasn't complete, shouldn't the – would the district court have to hold things until the EA was completed? Your Honor, the EA was complete, so we're not – I'm giving you a hypothetical. No one wants to answer hypotheticals today. They just want to stick to their positions on the case. I'm happy to answer Judge Biden's hypothetical, and I would say that – I mean, the fact that the EA was completed is terrific, but you're arguing that the statute of limitations was triggered by the filing of a proposal, not a decision. Now, what I'm trying to figure out is, let's suppose that you – that the government issued a proposed EA in which it asserted a claim to the land. You say that that triggers the statute of limitations, which means somebody's got to respond immediately, file a quiet title action,  If that came before a district court, should the district court wait, or has the district court got to proceed on the quiet title action? Two responses. First of all, Your Honor, if we were dealing here with a draft EA, we might have a different question, but here it was not a draft EA. It was a final EA, and in the final EA, the watershed EA, and again in the EA supplement, the Forest Service was taking the position that we have the authority to close this road. So they can take the authority for all kinds of space out there. To close the road. I mean, to close any road. That doesn't necessarily mean they're going to do it. Your Honor, the Forest Service was taking that position as to this specific road over which the county was claiming. Then if you withdrew it later, let's go back to his hypothetical, whatever form your EA was in, but then you withdrew it later, then what's the lawsuit about? Your Honor, that would be a completely different case. And to answer Part 2 of Judge Bivey's question, no, the claimant would not have to file suit right away. You have 12 years to file suit under the Quiet Title Act. You could wait to see if what appeared to be just a proposal will live on. The EA may have been final, but it was being circulated for public review, right? We're talking about 1997. Is that right? Am I correct on that? That's right. Okay. But it was being circulated for public review and comments. I mean, if it's final, then there's no reason for the public to get all shook up over this if you're not going to listen to any of their comments, right? I mean, presumably, the issue of notice and request for comments suggests that there may be changes to the EA. That's true, Your Honor. But the important point about the EA documents here is that the Forest Service was claiming the authority to close these roads, and that is, under this Court's case law, is sufficient to trigger the running of the 12-year period. Now, the county can wait one year, two years, three years, 11 years. It just can't wait more than 12 years. Some EAs aren't put out to public comment, right? That's right. So if it were that type of EA, then you wouldn't be claiming this? No, Your Honor. If the EA were not put out for public comment, you would still look at the text of the EA. Is the government making a claim to have exclusive authority to close this road? And if the answer is yes, then the Quiet Title Act claim accrued. And whoever wants to bring a case has 12 years. I don't want to distract you from your argument on this point, which obviously you feel you have a chance to prevail on it. But why don't you address government prevailed below, right? On the merits. Yes. The district, but just to finalize this point, our position is that the district court shouldn't have reached the merits because it lacked jurisdiction. I got that. But it did. So tell me why it got it right. Well, for three basic reasons. First, the district court didn't make any clearly erroneous factual findings or inferences. Let me just clarify that. I want to make sure I understand it. So there were cross motions for summary judgment. That's right. Right? That means that both sides were contending that there were no disputed facts. Well, I think this was an unusual summary judgment proceeding because the parties were essentially, and the district court recognized, the evidence here happened so long ago in the late 19th century. It's all historical. It's all historical. Both parties had a historical expert. Well, you could have competing experts. Yes. Well, there were two different expert reports or analyses. But the parties admitted that if we had a trial, which would have been a bench trial, this is the historical record. So what the district court actually did was conduct a bench trial. It sat as the finder of fact on a stipulated historical record. Right. And it drew the inferences that it did, and they were not clearly erroneous. So I think your co-counsel, or not your co-counsel, but Appellate's counsel, basically we sort of said that when you get to the factual issues, that's going to be a harder rock for him to push uphill. So it's really about the district court's interpretation of the cases as to what is public use, what is desultory, or I can't say that. I don't know. But the district court got that wrong in terms of that. Well, I think Mr. Meyer agrees that the district court identified the correct tests that applied at this time. Well, the correct cases. But he sort of reads those cases a little bit differently. Yes, and I actually agree with Mr. Meyer that the ‑‑ although I appreciate Judge Bivey's points about the Kirk case, but I think that the two more recent cases that Mr. Meyer is focusing on, Galley and Sopatic, if I'm pronouncing that correctly, are the two most recent cases. Where I disagree with Mr. Meyer is that I believe he took the position that in Galley, the court found that there had been proved up five years of regular public use. In fact, in Galley, the Idaho Supreme Court rejected that claim. So on the one hand, you have Galley, which found no five years of regular public use, and on the other hand, you have Sopatic, which found that the test had been fulfilled, had been met. And it doesn't look like there's a lot of evidence in Sopatic. Well, I have to disagree with Mr. Meyer. Again, on the facts of Sopatic, he said that the Idaho Supreme Court in that case was willing to infer five years of regular public use, but solely based on four mining claims up the road. But that's incorrect. I think if the court reads the Sopatic case, and we addressed this in the brief, there were multiple factors that the court relied on. And the first one that the court cited was that the road, Anderson Creek Road, I believe, in that case, intersected in Gibbonsville with another road. It was clear that one of those roads was Anderson Creek Road, and it was also clear, the evidence showed that there were structures and houses lining Anderson Creek Road. I mean, in this case, that's certainly not the situation. Well, why isn't it enough here, though, if the Eagle Rock Road came into existence in 1883, right? Why isn't the fact that some miners continued to work their claims around Eagle Creek after 1884 sufficient circumstantial evidence of the regular usage of the road to establish an RS-2247 right away? Well, because there's an incorrect factual premise there, Your Honor, in your question. And that would be? That's also where Mr. Meyer and I disagree, is that there is not, or a finder of fact could decline to infer that there had been so-called, that the miners had continued to work their claims for five years after the bust of Eagle Creek. We don't know that from the record. The district court was, I can actually quote what the district court had to say about this, and it's not clearly erroneous. Well, it's not direct evidence, but it could be circumstantial evidence. I suppose, but the finder of fact isn't required to draw that inference on a very thin factual record. The district court said, and this is at ER page 42, it's page 34 of the opinion, some publications contain occasional mention of the mining claims in the area, though a scant detail, if any, about whether such claims are being worked, and if so, to what degree by their owners. Also relevant, I think, is where the district court quoted from the Galley case regarding the government mineral surveys. The court said, a description of the access to the mining claims as, for some but not all, a partial stretch of good wagon road, and in all other instances a good trail, does not suffice to establish as a matter of law, meaning Idaho law, a history of regular public use as is required under applicable law. And then the judge quoted from Galley where the Idaho Supreme Court had said, the only documentation was the survey maps and notes, which is not adequate to show regular public use for five years. And we know, in fact, if the court takes a look at the one load claim, the survey notes and such that the county put in its excerpts of records, it's the so-called Croesus load. That claim was located in June of 1884. It was surveyed in 1888. But we don't, other than the fact that two tunnels had been developed on that claim during those four years, other than that bare fact, we don't know anything else about whether the owner of that claim, actually there were two applicants on that, so we're only talking about two people, a gentleman named Lee Mantle and another person, Charles Warren. We don't know what work they did, how often, if at all, they used this trail to do the tunneling work. There were two different ways of reaching that. Let me just see if I understand your argument in terms of Shoshone has the burden. Yes. And so what you're saying, they just didn't meet their burden. That's right. There may be some evidence it wasn't enough to tip it. A reasonable finder of fact could refuse to draw the inferences upon inferences that the county was suggesting. Yes, Your Honor. And the district judge only made them prove their case by preponderance of the evidence, which is like the lowest possible of the various alternatives that are sometimes discussed. But that wasn't legal there, was it? No, the government is not claiming that that was. No, and the county doesn't claim it was legal there. No, the county's position is that to the extent anyone might put them to a clear and convincing evidence test, that is wrong. But the district court here said it doesn't matter. Judge Callahan suggests that if this is nothing more than a court trial, here's all we got, you decide the facts and the district court is free to draw reasonable inferences from the facts. I mean, I think it's pretty hard for the county to suggest that the inferences the court drew were inappropriate. I agree with you, Judge Pius, and that's why the district court should be affirmed, assuming that this court reaches the merits. But I don't want to give up on my jurisdictional argument. I understand that. And I think just not to belabor it. You're the only one that's sitting out there. If we ask you hypotheticals, we're not asking you to give up on your arguments, so you don't have to keep telling us. We know that. But I only emphasize this because it is jurisdictional. It's not just sort of a – Well, it's not really jurisdictional. It's failure to establish an element of the claim. It's timely. No, that's one way of looking at it, Your Honor. But the Supreme Court in cases like Block v. North Dakota, this court in Kingman-Toll, Kingman-Reef-Atoll, said this is jurisdictional. The statute of limitations in the Quiet Title Act specifically is jurisdictional. Because it's a sovereign immunity. Yes, because it's a very limited waiver of the U.S. and the United States' sovereign immunity and has to be narrowly construed. And here it's just under this court's – No one will ever think you gave up on that. Thank you. But I just want to emphasize that this court's own precedents support the government's claim. It's not something that we're just developing for the first time in this case. The cases like McFarland and Michel and these cases that involve rights of access over federal lands all set up this test about all that is necessary and what is sufficient to trigger the running of the statute of limitations in the Quiet Title Act is the government's assertion of exclusive authority to block or terminate. Yeah. And I think that in principle I don't think there's any argument here. The question of assertion of exclusive authority, the question here is whether that is an unambiguous assertion or whether it's a qualified assertion. Your Honor, it's as unambiguous as I think you could get. Well, not if it's still open for public comment. Either that or the request for public comment is illusory. The request for public comment, Your Honor, the Forest Service wouldn't be asking the public to opine on whether the government does or doesn't have the exclusive legal authority to close the borough? It doesn't have to exercise that authority, does it? I'm sorry? It doesn't have to exercise that authority. No, but exercise is not necessary. But if County of Shoshone had participated in that proceeding and had come forward with historical evidence, the government might have changed its mind. Your Honor, that was not the purpose of the environmental analysis. It may or may not be, but you've requested public notice and comment, and you're telling them that that is the triggering event. Yes, on the issues that were germane to the EA, which is the Forest Service has different alternatives. And the question of ownership or whether you had a dedicated public road in Idaho surely would have been relevant to the kinds of conclusions that you were drawing in the EA. Someone could have commented on that in the public. I think from the public comments, someone might have raised that kind of an issue, but I think the answer would have been that kind of issue has to be decided by a court in a quiet title act suit, and you have 12 years to bring the suit, so don't wait for more than 12 years, something like that. And the county really has only itself to blame for the fact that it waited so long. So Eagle Crack Road, Eagle, what is it, Eagle? Eagle Creek Road. Eagle Creek Road is located within this area that the Forest Service is trying to? Yes, Your Honor. It's not only located within the area. It is the exact road that the Forest Service has asserted authority, exclusive authority to close, thereby terminating any alleged historic access that the public might have. That's the assertion of authority in the EA. Are they declaring some areas wilderness areas or something? I mean, what's going on? No, there was a 100-year flood event that occurred in this area. Oh, that's right. And washed out, damaged, and was very environmentally harmful, so the Forest Service had to decide with respect to Eagle Creek Road, but I think there were 12 altogether of other roads or creeks in this general watershed. What are we going to do to fix the problem that the 100-year flood caused? And specifically with regard to Eagle Creek Road, the Forest Service claimed the authority, the exclusive authority to close the road, and that's what it meant in the EA by we're going to obliterate this portion, we're going to close this portion. The only thing that's relevant is that the government was claiming the authority to do that. Whether it was right about that or wrong about that or whether it would actually ultimately in its final decision decide to do that is not what is relevant for Quiet Title Act purposes. It's the assertion of authority that causes the claim to accrue, and that's clearly what was happening. That was the county and the public generally were put on notice of that by the publication. Did you look at the public record of that notice? When you do a notice and a request for comment once you give notice and the parties all submit, members of the public submit letters and whatnot, was there anything from the county? I looked at that, Your Honor, at least in the administrative record of the NEPA process that was submitted to the district court. I didn't find any comments coming back to the Forest Service from the county, but I would also note that the county has never said that we weren't on notice, we didn't know about the NEPA process or anything like that. They've just said, well, we knew about it or it doesn't matter whether we knew about it. Is there any evidence that they were advocating that the government take some action with respect to this area that it did? As far as the record that was submitted to the district court reflects or shows, the answer is no. The county is just now saying, oh, yes, we knew about these environmental assessments, but that doesn't matter because the only thing that triggers the Quiet Title Act statute of limitations running is the so-called final decision of the Forest Service, and for the reasons in our brief and that I've probably overstated or spent too much time on here, we think that that's wrong. That's what would trigger an APA claim to challenge the final decision, and if the county didn't want the road to be closed or thought the environmental analysis was improper under NEPA, somehow didn't justify closing the road, that final decision would have triggered the APA claim and it would have had six years to bring that. Can you tell me what, can you just point me where in the record in the EA the government asserted a right to the road? Is this, I'm looking at SER 143. It looks like it's page 9 of the EA down at the bottom where it discusses East Fork Eagle Creek. Is that the government's assertion of right or is there some place where it actually says we claim this road or we claim this road as public? I think you've cited the correct place. In our brief we have the citations for the place, the specific page in the EA and the supplemental EA where the government said one of the possibilities here is that we will obliterate, close, et cetera. 3.85 miles. That's page 9. Yes. And those statements were reiterated in the EA supplement that only dealt with the Eagle Creek Road specifically. And that's a claim to own the road? No, Your Honor. A claim to a taking or something? I mean, this couldn't be something else? No, it's an assertion of a, it's an assertion, maybe right, maybe wrong, but it's an assertion of the fee owner of the land over which the road runs to have exclusive authority to close, to obliterate, to remove this road, which is totally inconsistent with the notion that this is really a public road that has to remain open to the public. And that is the assertion that triggered the 12 years within which the county could have brought this Quiet Title Act claim and didn't. Was there anything in the EA that related to public roads, things that were obviously public roads? I don't believe so, Your Honor, because the focus of a NEPA analysis, sort of the underlying assumption is that these are Forest Service roads that the both. These are your own roads that you're entitled to do what you want to do with? Yes, the fee simple interest is held by the United States, and that includes the roads that run over the parcels over which the roads run. And here in the EAs, the government is expressing the authority of a fee owner of the land over which the road runs, is expressing the authority, exclusive authority to close off the roads if it deems that necessary for environmental purposes. So under your theory, when did the statute of limitations begin to run? What was the date? It began to run, I believe it's July 20, April 23, 1997, when the first EA was made publicly available, and at the very latest, July 25, 1997, when the supplemental EA, which made the same assertions of exclusive authority, became publicly available. And then the district ranger adopted or made a final decision at some point? Yes, in October of 1997. And that's the date that the district court used. That's the date the district court used, and that's the date that the county is saying is the only appropriate date for the accrual of the Acquired Title Act claim, and that's just incorrect. Okay. All right. Thank you. We'll let you go over your time. I believe the county has a few minutes of rebuttal. Thank you, Your Honors. I want to be clear on one thing, and it's in response to the characterization of the county's position by Judge Callahan. I want to be clear that the county would indeed have a tough road if we were attacking the factual inferences drawn by the district court. That is not what the county is doing. The county is saying, based on the very factual inferences that the district court drew, the county should have prevailed. Let me tell you which inferences I'm talking about. I'll just read short ones because I have such a short time. This is from the Memorandum Decision, Pages 37-38, describing Eagle Creek Road, and it says, still used by some to reach their claims to be sure. That's after the demise of the city. So the district court, this is not the county talking, the district court inferred still used by some. Elsewhere in the Memorandum Decision, Page 33, the same route describing the same route for a few minors that had existed before it came into existence. So the district court says it's just a few minors, but the district court's own factual conclusion is that it was used by a few minors. It continues. Now, this is from the Munn Report, Pages 13 and 14, that the road provided access to people who did some development work of the claims they had staked. Again, this is after the demise of the town of Eagle. Elsewhere in the Munn Report on Page 7, it says, its sole use became a way of providing access to the mining claims along the East Fork and its tributaries. Again, from the Munn Report, Page 15, in 1904, for example, there were only seven mining claimants reported on the East Fork. And what were they doing during this time after the demise? The miners were, quote, doing assessment work, and in some instances, a little development work. Now, the Munn Report loves to throw in these adjectives, saying not very much, very little, and so on, but the government's own admissions in the Munn Report is that the road was being used. And the Munn Report goes on to acknowledge that there was a mine. I said earlier that it operated for 20 years. I see now, it's quoting, over its 40-year history, the claim is said to have produced thousands of dollars. And maybe thousands of dollars wasn't much, but it's enough to create a road in Idaho. If this evidence isn't strong enough to create a road in Idaho 125 years ago, it will be very difficult to establish such road creation much of anywhere. Now, the Sepadic case was addressed by opposing counsel, Mr. Arbad, and he suggested that it was factually different because in that case, the court commented on the fact that there was a road through the little town of Gibbonsville that had lots of houses on it. That's true and completely irrelevant. There was no dispute in that case about whether it was a public road through the old town of Gibbonsville. That's not where Mr. Sepadic owned his ranch, where he was trying to block public access. It was upstream of that. That was the area that was in dispute, not the town of Gibbonsville. And the part of the road where the Idaho Supreme Court ruled in favor of Lemhi County and against Mr. Sepadic was based on four mining claims that were accessed by the road outside of the town of Gibbonsville. We pointed this out in our briefing, and I'm troubled that the United States continues not to address that important distinction. The United States also quotes from the Munn Report about there being a good road in part and then a good trail. The factual record is very clear that the good road was the part on Eagle Creek Road. The good trail was where they left Eagle Creek Road to approach the adjacent mining claims. So I think that was a little bit unfair on the part of the United States. Okay, your time is up. Thank you very much, Your Honor. Thank you, counsel. We appreciate your arguments and the matter is submitted. Thank you.
judges: Paez, Bybee, Callahan